683 So.2d 748 (1996)
STATE of Louisiana
v.
Billy PITTMAN a/k/a Billy McCarthy.
No. 95-KA-382.
Court of Appeal of Louisiana, Fifth Circuit.
October 1, 1996.
*753 Jack Capella, District Attorney, Terry M. Boudreaux, Assistant District Attorney, Gretna, for Plaintiff-Appellee.
Linda Davis-Short, Indigent Defender Board, Gretna, for Defendant-Appellant.
Before BOWES, GAUDIN and DUFRESNE, JJ.
DUFRESNE, Judge.

STATEMENT OF THE CASE
The defendant, Billy M. Pittman, was charged by grand jury indictment filed on September 15, 1994 with attempted first degree murder in violation of LSA-R.S. 14:27 and 14:30, aggravated rape in violation of LSA-R.S. 14:42, second degree kidnaping in violation of LSA-R.S. 14:44.1, car jacking in violation of LSA-R.S. 14:64.2 and possession of a firearm by a convicted felon in violation LSA-R.S. 14:95.1. When arraigned, he entered a plea of not guilty and not guilty by reason of insanity to the charges. Following a sanity hearing, the trial court found the defendant legally sane and competent to assist counsel. The trial court heard a motion to suppress identification, a motion to suppress confession and a motion to suppress evidence. At the conclusion of the hearings that date, the court denied the motion to suppress identification and motion to suppress confession and took the motion to suppress evidence under advisement which was later denied also.
The State severed the charge of possession of a firearm by a convicted felon and amended the indictment to reflect that the defendant was also known as Billy McCarthy. The defendant then proceeded to trial that date on the remaining charges of attempted first degree murder, aggravated rape, second degree kidnaping and car jacking. Prior to the commencement of trial, the court denied the defendant's motion in limine to exclude two photographs. On the second day of trial, the court denied the defendant's motion to change venue, and when the defendant re-urged the motion, the court again denied it. At the conclusion of the seven-day trial, the jury returned with a verdict of guilty as charged on all four counts.
Subsequently, the State filed a multiple offender bill of information on March 15, 1995 seeking enhanced sentencing of the defendant as a second felony offender. On July 15, 1995, the trial court sentenced the defendant to 50 years at hard labor without benefit of parole, probation or suspension of sentence on the attempted first degree murder conviction, life imprisonment at hard labor without benefit of parole, probation or suspension of sentence on the aggravated rape conviction, 40 years at hard labor with the first two years being served without benefit of parole, probation or suspension of sentence on the second degree kidnaping conviction, and 20 years at hard labor without benefit of parole, probation or suspension of sentence on the car jacking conviction. The court ordered the sentences to run consecutively with each other and granted the defendant credit for time served. The court further ordered the defendant to register as a sex offender in accordance with LSA-R.S. 15:542. After accepting the defendant's stipulation to the multiple offender bill of information, the court vacated the sentence on the attempted first degree murder conviction and resentenced the defendant to 100 years at hard labor without benefit of parole, probation or suspension of sentence on that conviction. The court then ordered that 100-year sentence to run consecutively with the other sentences and the court denied the defendant eligibility for good time.

FACTS
On the evening of August 18, 1994, Andre Daigre and her 13-year old daughter Sara stopped to "get gas" at the Time Saver convenience store located at the corner of Vintage Drive and Williams Boulevard in Kenner, Louisiana. After pumping the gas, Ms. Daigre began walking to the store in order to pay for the gas while Sara remained inside the vehicle listening to the radio. As Ms. Daigre proceeded to the store, she noticed the defendant sitting nearby on a picnic table, and the defendant "jumped in" her vehicle when she entered the store.
*754 The defendant was armed with a gun which he pointed at Sara and told her that if she remained quiet everything would be okay. Sara started crying and asked the defendant to leave; however, the defendant refused saying that he would drop her off in "St. Rita's or St. Rose's Parish." The defendant then "took off" in the vehicle along with Sara.
When Ms. Daigre exited the store, she noticed that her vehicle was missing and she yelled at the store's cashier to call the police. Within minutes, Officer Barreca arrived at the Time Saver and he spoke to Ms. Daigre. She told him what happened and gave him a description of her vehicle. The officer also spoke to Edward Locket who had observed the defendant entering the vehicle and he provided a description of the defendant. Officer Barreca then broadcasted a "be on the lookout" bulletin regarding the stolen vehicle and kidnaping.
After hearing the broadcast, Officer Vaughn, who was working an off-duty security detail at Sam's Wholesale Store, left the store and positioned his marked unit so that he could observe the traffic in the 3000 block of Loyola Drive in Kenner, Louisiana. Shortly thereafter, he observed Ms. Daigre's vehicle occupied by the defendant along with Sara traveling southbound in heavy traffic. According to Sara, the defendant "was kind of mumbling to himself" at that time. When Officer Vaughn noticed the vehicle backing up "to get out of the lane of traffic," he exited his unit with his weapon drawn, ran to the side of the vehicle and ordered the defendant to halt. Upon observing the advancing officer, the defendant "pulled out into the traffic lane." Officer Vaughn returned to his unit in order to pursue the defendant. He proceeded down Loyola Drive and observed the vehicle traveling on the westbound entrance ramp of I-10. While proceeding westbound on I-10, he was "flagged down" by a motorist who advised him that "the car made a U-turn on the I-10 in the median way before you got on it." Officer Vaughn then "crossed" the I-10 and headed eastbound searching for the vehicle.
Subsequently, the defendant parked the vehicle in front of a warehouse in order to change a flat tire and while the defendant attempted to change the tire, Sara sat on the curb. The defendant had difficulty removing the tire and the vehicle "fell off the jack" before the defendant was able to mount the spare tire onto the vehicle. The defendant then "brought" Sara to an adjacent field where he forced her to have sexual intercourse. While engaged in the act of intercourse, Sara grabbed the defendant's gun, but the defendant "took" it from her. Later, the defendant instructed Sara to close her eyes, and when she did as instructed, the defendant shot her in the forehead at close range.
Kenyon Childs, who was riding his bicycle at the nearby Aberdeen stables, heard the shot which sounded "like a loud firecracker." When he looked in the direction from which the noise originated, he saw the defendant walking with an object in his hand "wrapped up in something."
Meanwhile, in response to the bulletin regarding the stolen vehicle and kidnaping, Officer Cunningham decided to patrol the area between Veterans Boulevard and the airport. He described that area as a "warehouse area" which is "not a well-traveled area." When he subsequently approached a warehouse located at 2119 Aberdeen Street, he noticed Ms. Daigre's vehicle which was missing a tire on the front passenger side. He did not see anybody in the vicinity and the warehouse was closed. Upon searching the adjacent field, he found Sara laying on the ground on her side. There was a lot of blood on the scene and he could hear her breathing heavily. Her eyes were opening and closing and she did not respond when he called her name. He immediately summoned an ambulance and Sara was transported to the hospital.
Following the issuance of an arrest warrant on the evening of August 19, 1994, Detective Ortiz stopped a vehicle occupied by the defendant, a female and three juveniles, and after ordering the defendant to exit the vehicle, he arrested him. A search of the vehicle was conducted and a gun was found in the rear hatchback compartment.
*755 Subsequently, the defendant was transported to Kenner Lock-up where he gave a tape-recorded confession to Detective Pepitone and Agent MacLean. In particular, the defendant admitted taking the vehicle but did not realize it was occupied by Sara until driving three or four blocks; he acknowledged having intercourse with Sara, but claimed that it was consensual; and he stated Sara was shot when the gun accidently discharged.

ASSIGNMENT OF ERROR NUMBER ONE
The trial court erred in denying defendant's motion for change of venue.

DISCUSSION
The defendant contends that the trial court erred in denying his motion for change of venue. The defendant argues that the substantial pretrial publicity concerning the facts of the case made it impossible to obtain a fair and impartial trial.
On the first and second day of the jury selection process, a "pre-screening voir dire" was conducted in which prospective jurors who had heard or read anything about the case were questioned privately and individually and were specifically asked whether they could disregard anything previously known about this matter and decide the case purely on the evidence introduced at trial. On the first day of the "pre-screening voir dire," 44 prospective jurors from a panel of 50 were questioned and 16 were excused.
Prior to the commencement of the "pre-screening voir dire" on the second day, the defendant filed a motion for change of venue and the trial court denied the motion stating the following:
The Court has the foremost concern as to the fairness of any trial that it presides over. It takes notice that the State as well as the defendant is entitled to a fair and impartial trial. Mr. Amstutz [defense counsel] is correct and we have observed that a number of the jurors have certain information relative to this trial some of which is accurate, some of which has not been. The Court has allowed the attorneys an opportunity to challenge those jurors whom they feel based upon their impressions and questioning did not meet the requirements to serve on the jury that they could be fair and impartial.... The issue here is not so much one of knowledge of what has occurred but the ability to be a fair and impartial juror, to listen to the evidence and apply the law and reach a fair and impartial verdict. I find at this point the examination which the Court has conducted that we can in fact select a jury which will be fair and impartial.
Thereafter nine prospective jurors from a panel of 12 were questioned and seven excused and defense counsel re-urged his motion for change of venue. The trial court again denied the motion noting "that out of the 12 jurors there are five and that does move us along towards the proper jury in this case."
LSA-C.Cr.P. art. 622 provides:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
Under this article the defendant must prove more than mere public knowledge of facts surrounding the offense to be entitled to have his trial moved to another parish. The burden of proof is on the defendant to show that there exists such prejudice in the collective mind of the community that a fair trial is impossible. State v. Vaccaro, 411 So.2d 415 (La.1982).
A number of factors are considered in determining whether a change of venue is appropriate. These include (1) the nature of the pretrial publicity and the particular degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the dissemination of *756 the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. State v. Bell, 315 So.2d 307 (La.1975), appeal after remand, 346 So.2d 1090 (La.1977). The court may also consider the level of publicity in the area to which venue could be changed; the care exercised and the ease encountered in selecting the jury; the prospective jurors' familiarity with, and resultant effects of, the publicity; the peremptory challenges and challenges for cause exercised by the defendant in jury selection. State v. Henderson, 566 So.2d 1098 (La.App. 2d Cir.1990). Whether a defendant has made the requisite showing for a change of venue is a question addressed to the trial court's sound discretion which will not be disturbed on review in the absence of an affirmative showing of error and abuse of discretion. State v. Vaccaro, supra.
The record does not show the nature or degree of the pretrial publicity connected to the case; however, admittedly 53 of 62 prospective jurors had heard or read something about the case, and in its brief, the State conceded the presence of "the extreme nature of pretrial publicity."
A portion of the publicity appears to have been released by law enforcement officials considering that at the motion for change of venue, defense counsel's stated:
In this morning's paper [February 2, 1995] there's a quote by the Chief of Police of Kenner that referred to this case "as one of the most horrible in the history of the City of Kenner." These have been the comments of the City of Kenner and of the parish officials, the government officials since day one on this case.
The State conceded that others factors itemized in Bell were present such as "the fact that the publicity continued up to the onset of the trial, the severity and notoriety of the offenses, etc." Additionally, fundraising efforts on behalf of the victim were being conducted in the community and prospective jurors were questioned whether they had contributed to the fund. However, there was no evidence which called into question either the candor or veracity of the prospective jurors.
Furthermore, during the "pre-screening voir dire," the State and the defendant jointly challenged for cause 20 prospective jurors and the trial court granted those challenges. Defense counsel also challenged for cause five prospective jurors, and although the trial court only granted three of those challenges, the defendant subsequently used peremptory challenges to excuse the other two prospective jurors. Thus, the defendant was allowed to eliminate the prospective jurors who expressed doubt about their ability to consider the evidence without regard to what they had heard or read about the case. Additionally, there was no particular difficulty with jury selection and the defendant utilized only nine of his allotted 12 peremptory challenges during selection of the jury.
Therefore, any prejudice which resulted from the publicity in this case was not such that the defendant could not obtain a fair and impartial trial and that the trial court did not err in denying the defendant's motion for change of venue.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER TWO
The trial court erred in denying defendant's motion to exclude gruesome photographs.

DISCUSSION
The defendant contends that the trial court erred in denying his motion in limine to exclude two gruesome photographs. Specifically, the defendant argues that the trial court abused its discretion in allowing the introduction of the photographs "inasmuch as their prejudicial value clearly outweighed any probative value they may have had."
The challenged photographs depict different views of the victim lying on the ground on her left side, and one of the photographs clearly show her bloody face and the bullet entry wound on her forehead.
*757 In denying the motion in limine, the trial court gave the following reasons:
I have reviewed two photographs. I am satisfied that the photographs contain information which has probative value and I'm not further satisfied that the photographs themselves would not overwhelm the jury's reason whereby they would be deprived of their ability to make their decision based upon the law and the evidence in this case. I note that one of the photographs, particularly the photograph which has a picture of the victim in the case lying on her side where her facial area is very clearly shown and the entry of the bullet as depicted, the Court is going to permit that photograph into evidence. I have considered very closely the second photograph whereas it containswell, I'm going to allow both of the photographs into evidence. They contain two different views of the victim in this case. The second photograph I believe is less, I don't want to say offensive, but less disturbing than the first and the first is the one which the Court will allow in for the reasons that I believe it is necessary for the jury to appreciate what the scene was on the day that this event occurred. Since I do not find the second photograph as disturbing as the first one, and by disturbing I don't mean to suggest any negativeness except that obviously someone was injured, I'm going to allow both of the photographs in.
In State v. Moore, 498 So.2d 82, 84 (La.App. 5th Cir.1986), this court set forth the standard used to determine the admissibility of allegedly gruesome photographs as follows:
The test used in determining admissibility of photographs is whether the probative value of an allegedly gruesome photograph outweighs its prejudicial effect upon the jury, State v. Dean, 487 So.2d 709 (La.App. 5th Cir.1986). The evidence, of course, must also be relevant for some purpose, and a balance must be struck between the evidentiary value of the photograph and its tendency to overwhelm reason and to associate the accused with the atrocity without sufficient evidence, State v. Sterling, 377 So.2d 58 (1979).
Furthermore, the trial court's admission of an allegedly gruesome photograph will be overturned on appeal only if the prejudicial effect clearly outweighs the probative value. No error will be found unless the photographs are so gruesome so as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. State v. Eaton, 524 So.2d 1194 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989), rehearing denied, 489 U.S. 1061, 109 S.Ct. 1332, 103 L.Ed.2d 600 (1989).
In the instant case the photographs were relevant to show the condition in which the victim was found and thus they were probative of the defendant's specific intent to kill. Therefore, the probative value of the photographs outweighed any possible prejudicial effect they may have created in the jury's mind. Furthermore, although grim, the photographs are not so gruesome as to overwhelm the jurors' reason and to lead them to convict the defendant without sufficient independent evidence. As such, the trial court did not err in denying the motion to exclude the photographs.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER THREE
The trial court erred in admitting other crimes evidence.

DISCUSSION
The defendant contends that the trial court erred in admitting other crimes evidence in that the State failed to meet the prerequisites to admissibility of such evidence.
In accordance with LSA-C.Cr.P. art. 720 and State v. Prieur, 277 So.2d 126 (La.1973), the State filed a pre-trial notice of its intent to use evidence of other crimes. Specifically, the State noticed its intent to introduce evidence relating to the theft of a vehicle from Anna Williams on or about August 11, 1994. After conducting a Prieur hearing, the trial court ruled that the evidence was admissible.
At trial, the State offered the testimony of Anne Williams and Patricia Rhodes in presenting other crimes evidence for the purpose *758 of showing system. Ms. Williams testified that on August 11, 1994 she parked her gold Pontiac in front of the Circle K convenience store located on Jefferson Highway in Jefferson Parish. She entered the store leaving her keys and her purse in her vehicle; and when she exited the store, she discovered that her vehicle was missing. About eight days later, the police found it in a church parking lot on Incarnate Word, in Kenner, Louisiana.
Patricia Rhodes, who resided next to the defendant in August of 1994, testified that the defendant showed her a brown Pontiac which he admitted stealing about a week before August 18, 1994 "off of Jefferson Highway as a lady was going into some kind of store...." He also told her that the lady's purse was left in the vehicle. Ms. Rhodes further testified that the police recovered the vehicle "from the Baptist Church on the corner."
In general, evidence of other crimes is inadmissible in the guilt phase of a criminal trial for several reasons. Admission of evidence that the defendant may have committed other crimes creates the risk the defendant will be convicted of the present offense simply because he is a "bad person." Juror confusion may occur where collateral issues are introduced. In addition, a defendant may not be prepared to face such attacks. State v. Code, 627 So.2d 1373 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994), rehearing denied, ___ U.S. ___, 114 S.Ct. 2775, 129 L.Ed.2d 887 (1994); State v. Prieur, supra.
Statutory and jurisprudence exceptions exist to this rule where the state offers evidence of other crimes for purposes other than to show the character of the defendant. State v. Code, supra. LSA-C.E. art. 404B(1) provides such an exception:
Except as provided in Article 412 [not relevant here], evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, by admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
In State v. Hatcher, 372 So.2d 1024, 1033 (La.1979), a case recently reaffirmed in State v. Code, supra, the Louisiana Supreme Court fully discussed the requirements for admissibility of other crimes evidence under the system or modus operandi exception:
In order to be admissible the extraneous offense evidence must meet several tests: (1) there must be clear and convincing evidence of the commission of the other crimes and the defendant's connection therewith; (2) the modus operandi employed by the defendant in both the charged and the uncharged offenses must be so peculiarly distinctive that one must logically say they are the work of the same person; (3) the other crimes evidence must be substantially relevant for some other purpose than to show a probability that the defendant committed the crime on trial because he is man of criminal character; (4) the other crimes evidence must tend to prove a material fact genuinely at issue; and (5) the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. (citations omitted)
However, the other crimes evidence in particular did not appear to prove a material fact genuinely at issue in light of the defendant's confession to the carjacking which was also ruled admissible. Nevertheless, even if the other crimes evidence should not have been admitted at trial, its admission may be considered harmless.
The erroneous admission of other crimes evidence is subject to harmless error analysis. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94, reconsideration denied, 94-1379 (La.4/8/96), 671 So.2d 332. The analysis for determining harmless error is whether the verdict actually rendered in this case was surely unattributable to the *759 error. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), on remand, 623 So.2d 1315 (La.1993); State v. Johnson, supra.
Considering the overwhelming evidence of the defendant's guilt, it is clear that the admission of other crimes evidence showing that the defendant previously committed a theft was at best harmless error.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER FOUR
The evidence was insufficient to uphold the verdict.

DISCUSSION
The defendant contends that the evidence was insufficient to uphold the verdict. Specifically, the defendant argues that the evidence supported his claim of not guilty and not guilty by reason of insanity.
LSA-R.S. 14:14 provides:
If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility.
There is a legal presumption that the defendant is sane and responsible for his or her actions. LSA-R.S. 15:432; State v. Armstrong, 94-2950 (La.4/8/96) 671 So.2d 307. Accordingly, the defense has the burden of proving, by a preponderance of the evidence, that the defendant at the time of the offense was incapable of distinguishing between right and wrong with reference to the pertinent conduct. LSA-C.Cr.P. art. 652; State v. Armstrong, supra.
The question of whether or not defendant affirmatively proved his insanity and should not be held responsible for his actions is one for the jury. All of the evidence, including both expert and lay testimony, and the conduct and action of the defendant, should be considered by the jury in determining sanity. State v. Bibb, 626 So.2d 913 (La.App. 5th Cir.1993), writ denied, 93-3127 (La.9/16/94), 642 So.2d 188, reconsideration denied, 93-3127 (La.10/28/94), 644 So.2d 648. To sustain a conviction in which insanity is an issue, the appellate court, viewing the evidence in the light most favorable to the prosecution, must determine that a rational trier of fact could have concluded that the defendant did not prove by a preponderance of the evidence that he was insane at the time of the offense. State v. Armstrong, supra.
In State v. Bibb, 626 So.2d at 934, this court stated the following:
The reviewing court properly looks to the expert and lay testimony and to the defendant's actions. The factors pertinent to a review of expert testimony are wide-ranging. They include whether lay testimony controverting the expert opinion was offered, whether the experts specifically concluded that the defendant could not discern between right and wrong at the time of the crime, to what extent the expert testimony was premised on the selfserving revelations of the defendant, to what extent the expert analysis is controverted by other expert analysis, the duration of the expert's contact with the defendant and whether he had interviewed the defendant previous to the offense, the chronological proximity of the expert examination to the offense, and whether the experts were treating physicians. Insofar as the defendant's actions, such factors as whether the defendant fled, disposed of evidence, and deliberately planned and executed the offense are pertinent. (citations omitted)
The defendant presented the testimony of several witnesses including Dr. Deborah Giorgi-Guarnieri, Dr. Marc Zimmermann and Dr. Douglas Greve.
Dr. Giorgi-Guarnieri, an expert in the field of forensic psychiatry, testified that she examined the defendant on October 26, 1994 for approximately an hour in order to determine his competency to stand trial. She indicated that the defendant had behavioral problems in school and twice was placed in a juvenile detention center. She noted that early in his life the defendant had used drugs including marijuana, cocaine, LSD and angel dust, but had not used any "hard drugs" since 1979. She stated that the defendant had seen a psychiatrist in the sixth or seventh grade but *760 had to stop when his parents could no longer afford it; had "freaked out" after smoking marijuana; had been treated at a substance abuse center in 1979; had gone to Charity Hospital in 1983 for a two or three day admission; and had recently applied to a mental health center for treatment. She further stated that the defendant had been placed on Stelazine, "a major tranquilizer," for psychiatric treatment and had experienced difficulty holding jobs for a long time because he did not get along well with people. In finding that the defendant was able to understand the proceedings against him and able to assist in his defense, she concluded that "his psychiatric history was significant for the substance abuse that he had in the past and the behavioral problems." However, she subsequently explained that just because an individual has behavioral problems it does not mean that he does not know right from wrong.
Dr. Zimmermann, an expert in psychology and forensic psychology, testified that he reviewed a number of documents including the defendant's school records, evaluations by other mental health professionals and the defendant's confession. He noted that the defendant had trouble in adjusting to school, was referred for evaluation by Dr. Hannie and was recommended for counseling when he was in the ninth grade. He stated that if you "look at his whole history that we have from those [school] records, because those are the earliest records we have, to the present situation, it just shows a progression of an individual who had difficulty dealing with other people and functioning in a situation, such as school." He indicated that the references in the defendant's confession to being angry and having feelings of frustration were significant because "those are terms that show up from elementary school on, that had problems with confusion, with anger and frustration." He stated that a psychiatric evaluation performed in 1981 described the defendant's inability to function appropriately in society and had a diagnosis of a personality disorder. He noted that Dr. Hannie's report made reference to "schizoid tendencies" which "show a propensity of an individual not to be able to make connections with other people." He further noted that in his report Dr. Hannie expressed a concern for the defendant's emotional problems and recommended that the defendant receive a neurological evaluation to determine if neurological problems existed. He reviewed a "test profile" dated March 27, 1981 describing the probability of a personality disorder and it stated that the defendant was not a suicidal risk at that time. He reviewed an "assessment summary" dated April 24, 1981 which noted "self-injury" and "runaway" as precautions or special needs. He indicated that a "social history" which was "generated" on May 13, 1981 described the defendant as being very depressed and having an underlying anger and he stated that such depression and anger appeared to be a progression of a deterioration of the mind. He stated that a "Psychological Assessment" dated July 29, 1981 which noted some indications that the defendant was suicidal and possibly homicidal was significant in that it showed further deterioration. He further stated that the records of East Jefferson Mental Health Center dated July 12, 1994 revealed that the defendant continued to have many of the same problems and that his condition did not improve despite having taken Stelazine.
Dr. Zimmermann additionally testified that he examined the defendant on January 6, 1995. He stated that there was a 92% probability of the defendant having brain dysfunction and he reported that the defendant had schizoid, borderline and anti-social personality characteristics. He then testified that a mental disease or defect existed on August 18, 1994 and that it affected the defendant's ability to differentiate right and wrong.
Dr. Greve, medical director of the East Jefferson Mental Health Center and expert in psychiatry, testified that on July 15, 1994 he reviewed the defendant's application wherein the defendant stated that he had a bad temper all his life. Dr. Greve "felt" that the defendant had enough symptoms to be admitted to the Mental Health Center; however, he did not have enough evidence to make a diagnosis. Additionally, he recommended that the defendant be placed on a waiting list since he did not meet the criteria of an emergency, priority or chronic mentally ill patient.
*761 In rebuttal, the State presented the testimony of Ron Coe, Dr. Thomas Hannie, Jr. and Dr. Robert Davis.
Coe, a fourth-year medical student, testified that while working in the Jefferson Parish Correctional Center on August 23, 1994, he examined the defendant upon his arrival. He stated that the defendant was very cooperative and quite friendly and had no problems answering questions posed to him. He further stated that it did not appear that the defendant was delusional.
Dr. Hannie, an expert in psychology, testified that he treated the defendant in March and April of 1978. He stated that at that time the defendant had some emotional problems, but he did know right from wrong. At the request of the prosecution, he again saw the defendant on January 18, 1995 and he administered psychological tests. He stated that one of the tests indicated that the defendant was "faking" illness. He diagnosed the defendant "as anti-social personality disorder with malingering" and he stated that malingering meant "exaggerating symptoms with a purpose in mind, which is to, in his case, to evade prosecution or to evade whatever was going to happen to him as a result of what he did." When asked if someone with an anti-social personality knows right from wrong, Dr. Hannie stated the following:
Yes. The anti-social personality is what we call a personality disorder. It's a long-term style of living. It is somethingwith anti-social personality disorders, it usually starts as an adolescent, can even show up in childhood, and these people continually fail to respect the difference between right and wrong; they, instead, act on impulse and do whatever they want to do when they want to do it without respect for anyone and without respectwithout concern for the consequences. They know something is right or wrong, and they may know that there are consequences, but they don't worry about the consequences, they do whatever they want to do immediately.
Dr. Hannie disputed Dr. Zimmermann's finding that the defendant had a 92% probability of brain dysfunction because the test employed by Dr. Zimmermann was not adequate for that purpose and he stated that the presence of a mild brain dysfunction does not mean that a person can't tell the difference between right and wrong. He further stated that although the defendant had emotional problems, he knew the difference between right from wrong at the time of the offenses and that his many attempts to avoid detection during the commission of the offenses was indicative of that ability.
Dr. Davis, an expert in forensic psychiatry, testified that he reviewed numerous documents and he stated that in those documents there was absolutely no indication that at anytime the defendant did not know the difference between right and wrong. He saw the defendant on November 16, 1994 and on December 28, 1994 at the jail. He noted a "marked difference in the two presentations" in that in the second interview the defendant "really began to fake symptoms of mental illness." He stated that the defendant had an anti-social personality disorder. Additionally, he testified as follows:
Q. [Prosecutor] So, in your opinion, you're telling this jury this man right here [defendant] is faking mental illness?
A. [Dr. Davis] In my opinion, in terms ofyes, I think he is faking mental illness.
Q. And that, actually, he knowsfrom everything that you've gathered from your two interviews with him, your reviews of all the statements and the documents from the doctors, that this man knew right from wrong on August 18th of 1994, the man standing in front of me, Billy Pittman?
A. Billy Pittman, in my opinion, knows right from wrong. All of his behavior indicates that he knows right from wrong; his evasive behavior, his running away, his avoiding behavior, everything that he did, yes.
Considering the evidence presented in the light most favorable to the prosecution, a rational trier of fact could have found that the defendant did not prove by a preponderance of the evidence that he was insane at the time he committed the offenses.
This assignment is without merit.

*762 ASSIGNMENT OF ERROR NUMBER FIVE

The trial court erred in denying defendant's motion to suppress his statement.

DISCUSSION
The defendant contends that the trial court erred in denying his motion to suppress confession. In support of this contention, the defendant argues that considering the injuries he received at the hands of the arresting officer, he could not have felt that he had a voluntary choice in giving a confession and thus his confession was the result of coercion.
Before a confession or inculpatory statement can be admitted into evidence, it must be established that the accused who makes the statement during custodial interrogation was first advised of his Miranda rights and that the statement was made freely and voluntarily and not under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. State v. Thucos, 390 So.2d 1281 (La.1980); State v. Simmons, 95-309 (La.App. 5th Cir. 10/18/95), 663 So.2d 790.
Whether a showing of voluntariness has been made is analyzed on a case-by-case basis with regard to the facts and circumstances of each case. State v. Benoit, 440 So.2d 129 (La.1983); State v. Simmons, supra. The admissibility of a confession or statement is in the first instance a question for the trial judge and his conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement will not be overturned unless they are not supported by the evidence. State v. Jackson, 414 So.2d 310 (La.1982); State v. Simmons, supra.
The fact that an officer had to use force to subdue an arrestee is certainly an element which the judge should consider on the question of voluntariness. Other evidence, however, may well convince the judge beyond a reasonable doubt that the statement nonetheless was voluntary. State v. White, 329 So.2d 738 (La.1976).
At the motion to suppress confession, Detective Ortiz testified as follows regarding the circumstances surrounding the defendant's arrest:
Well, I ordered him out of the vehicle, and I ordered him to lie down on the ground, face down. As I approached him to handcuff him, I grabbedI guess it would have been his left arm and tried to place it behind his back. He removed his hand from my grasp a little bit, and I ordered him again to put his hand behind his back. And at that point, he slid his hands up almost into a push-up position and attempted to raise himself off the ground. I regained control of him and placed his hands behind his back and handcuffed him.
Detective Ortiz further testified that after apprehending the defendant, he began to advise him of his Miranda rights, but the defendant "kept mumbling something and interrupting." Eventually, Detective Ortiz completed advising the defendant of his rights and he stated that defendant did not appear to be under the influence of alcohol or drugs. Detective Ortiz noted that the defendant had abrasions on his face of which some may have occurred during the arrest; however, the defendant never did complain of any injuries.
In addition to the testimony of Detective Ortiz which showed that the force used to arrest the defendant was neither excessive nor designed to compel a confession, the State presented the testimony of Detective Pepitone and Agent MacLean.
Detective Pepitone testified that he along with Agent MacLean took the defendant's confession at the Kenner Lock-up. Prior to the confession, he advised the defendant of his Miranda rights and the defendant signed the advice of rights form waiving his rights. He stated that he did not force, threaten or intimidate the defendant in any way nor did he make any promises to him. He further stated that the defendant had some scratch marks on his face and some swelling underneath one of his eyes.
Agent MacLean, a special agent with the FBI, testified that he witnessed the advisement of Miranda rights by Detective Pepitone and following that advisement, the defendant signed the advice of rights form. He *763 stated that neither he nor Detective Pepitone threaten the defendant nor did they make any promises to him. He also stated that the defendant had some form of an abrasion of the left cheek area of his face; however, he never complained about the injury nor did he ask for medical treatment.
Considering the above testimony, the defendant gave his confession freely and voluntarily, without force, coercion or inducements of any kind. Thus, the trial court did not err in denying the motion to suppress confession.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER SIX
The trial court erred in denying defendant's motion to suppress evidence.

DISCUSSION
The defendant contends that the trial court erred in denying his motion to suppress evidence. The defendant argues that the gun which was seized from a recessed compartment in the back of the station wagon which the defendant was driving was unlawfully seized in that "the state did not show an exception to the warrant requirement."
At the motion to suppress, Detective Ortiz testified that the "culmination of the investigation... led to the information" that the defendant was driving a white car which was located at either 205 or 207 Incarnate Word, Kenner Louisiana and that he was departing with a female. After a warrant had been issued for the defendant's arrest, Detective Ortiz along with Detective Jackson proceeded to that area. While proceeding down Incarnate Word, Detective Ortiz noticed a white station wagon backing out of the driveway of a residence numbered either 205 or 207. At that time, he observed that the vehicle was occupied by a male and female. Detective Ortiz followed the vehicle as it traveled down Loyola Drive. After identifying the driver as the defendant, he stopped the vehicle which was approaching the intersection of Loyola Drive and the westbound on-ramp of Interstate 10. When he stepped out of his unit, he ordered the defendant to exit his vehicle and to lay on the ground and the defendant complied.
Subsequently, while searching the defendant for weapons, Detective Ortiz asked him if he had any weapons on him and the defendant responded, "It's in the trunk." Upon looking at the station wagon, Detective Ortiz noticed that it had a "hatchback" instead of a trunk. He also noticed that there were three juveniles sitting in the rear seat. After moving the defendant from the rear of the station wagon, he requested another officer who had arrived on the scene to "get the keys and open the trunk." Thereafter, the gun was found in a recessed compartment where the spare tire and jack were stored.
Additionally, Eugene Fields testified at trial out of the presence of the jury as follows:
... just about the time I arrived home, which was about ten-forty in the evening, my pager went of. It was the informant calling. I went in and called him. He said get some people out here right away. He's at an address on Incarnate Word. He's got a girl there that's getting ready to take him out of town. He has the gun [which was employed in the commission of the crimes] with him. I called back to Kenner [Police Department] and relayed that information to them....
Fields further testified that he had known this informant for over 25 years and that he had previously provided reliable information on several occasions.
The Fourth Amendment to the United States Constitution and Article I, Section 5, of the Louisiana Constitution prohibit unreasonable searches and seizures. A warrantless search is unreasonable unless the search can be justified by one of the narrowly drawn exceptions to the warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); State v. Tatum, 466 So.2d 29 (La.1985). One of these is the "automobile exception," which is based upon the existence of probable cause to search and exigent circumstances. State v. Tatum, supra.
Probable cause to search exists when the total circumstances allow the conclusion that there is a fair probability that contraband or evidence of a crime will be found in a particular location. State v. Jackson, 629 So.2d 1374 (La.App. 2d Cir.1993), *764 writ denied, 94-0201 (La.5/6/94), 637 So.2d 1046. To determine whether the information furnished by a confidential informant provides probable cause for an arrest or search, a court must utilize a "totality of the circumstances analysis" and consider, among other things, the informant's veracity, facts relating to the informant's basis of knowledge and corroboration of the informant's information. While an informant's past record for accuracy and reliability is one factor to take into account in determining the reliability of the tip in question, this alone will not always support a finding of probable cause. Corroboration of details of an informant's tip by independent police investigation is valuable in applying a totality of the circumstances standard to these type cases. Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); State v. Raheem, 464 So.2d 293 (La.1985); State v. Hutchinson, 620 So.2d 1205 (La.App. 3rd Cir.1993), writ denied, 627 So.2d 661 (La.1993).
For constitutional purposes, there is no difference between seizing and holding a car before presenting the probable cause issue to a magistrate and carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment and Louisiana Constitution. State v. Tatum, supra.
Exigent circumstances has been defined as the impracticability of obtaining a warrant due to the possibility that the car could be moved either by its occupants if not arrested, or by someone else. An immediate warrantless search is therefore constitutionally permissible when the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained. State v. Tatum, supra.
In the instant case an informant who had provided reliable information in the past predicted that the defendant along with a female would be leaving town with the gun employed in the commission of the crimes and details of that tip were corroborated in that the officers observed the defendant departing with a female passenger. Considering the informant's information and the defendant's statement that a gun was in the trunk, the officers had reason to conclude, within a fair probability that evidence of the crimes would be found within the station wagon and thus probable cause to search existed.
Exigent circumstances also existed in that the station wagon was movable, the female passenger was alerted and the contents could have been destroyed before a warrant could have been obtained.
As such, this search fell within the automobile exception to the warrant requirement and therefore the trial court did not err in denying the motion to suppress evidence.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER SEVEN
The trial court failed to advise defendant of the prescriptive period for post conviction relief.

DISCUSSION
The defendant contends that the trial court failed to instruct the defendant of the prescriptive period for post conviction relief.
LSA-C.Cr.P. art. 930.8 dictates that, except under certain limited circumstances, a defendant must file his application for post conviction relief within three years after his judgment of conviction. Section C of the article provided that "[a]t the time of sentencing, the trial court shall inform the defendant of the prescriptive period for post conviction relief." The transcript of the defendant's sentencing reflects that the defendant was not so informed. However, failure to inform the defendant does not constitute ground for reversing the sentence or remanding the case for resentencing. LSA-C.Cr.P. art. 921. Rather the appropriate remedy is to instruct the trial court to inform the defendant of the provisions of LSA-C.Cr.P. art. 930.8 by sending appropriate written notice to the defendant within 10 days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of the proceedings. See State v. Kershaw, 94-141 (La.App. 5th Cir. 9/14/94), 643 So.2d 1289.

*765 ASSIGNMENT OF ERROR NUMBER EIGHT

Also assigned as error are any and all errors patent of the face of the record.

DISCUSSION
For the purpose of an error patent review the "record" in a criminal case includes the caption, the time and place of holding court, the indictment or information and the endorsement thereon, the arraignment, the plea of the accused, the bill of particulars filed in connection with a short form indictment or information, the mentioning of the impaneling of the jury, the minute entry reflecting sequestration in a capital case, the verdict, and the judgment or sentence. See State v. Oliveaux, 312 So.2d 337 (La.1975) and State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990).
A review of the record reveals the following errors.
1.) The defendant's constitutional guarantee against double jeopardy was violated. Both the United States and Louisiana Constitutions prohibit placing a person twice in jeopardy of life or limb for the same offense. U.S. Const. Amend. V; La. Const. Art. 1, Sec. 15. Double jeopardy provisions protect an accused not only from a second prosecution on the same offense, but also from multiple punishments for the same criminal conduct. State v. Vaughn, 431 So.2d 763 (La.1983); State v. Stack, 95-213 (La. App. 5th Cir. 7/25/95), 659 So.2d 853.
It is well settled law that when proof of a felony is an essential element of a first degree murder or an attempted first degree murder, double jeopardy precludes conviction and punishment of defendant for both murder or attempted murder and the underlying felony. State v. Stack, supra; State v. Holmes, 94-907 (La.App. 5th Cir. 3/15/95), 653 So.2d 642; State v. Head, 598 So.2d 1202 (La.App. 5th Cir.1992).
Because the State relied on the aggravated rape and/or second degree kidnapping as the underlying felony to prove the elements of attempted first degree murder, the provisions against double jeopardy have been violated. To remedy such a violation of double jeopardy, the reviewing court vacates the conviction and sentence for the less severely punishable offense and affirms the conviction and sentence for the more severely punishable offense. State ex rel. Adams v. Butler, 558 So.2d 552 (La.1990); State v. Head, supra.
Therefore, considering that the second degree kidnapping is the less severely punishable offense, the defendant's conviction and sentence for second degree kidnapping is vacated due to double jeopardy. However, his convictions and sentences for aggravated rape and attempted first degree murder are affirmed. See State v. Head, supra, where this court vacated the defendant's conviction and sentence for aggravated burglary due to double jeopardy, but affirmed his convictions and sentences for aggravated rape and attempted first degree murder.
2.) The defendant's sentence as a second felony offender on the attempted first degree murder conviction is illegal in that the trial court required the sentence to be served without benefit of parole. LSA-R.S. 15:529.1G only provides for the imposition of sentence without benefit of probation and suspension of sentence, and the sentencing provision of the underlying conviction at the time of the offense, LSA-R.S. 14:27D(1), did not provide for the imposition of sentence without benefit of parole, probation or suspension of sentence. See State v. See, 467 So.2d 525 (La.1985). Considering that LSA-C.Cr.P. art. 882 provides that an appellate court may correct an illegal sentence at any time, the 100-year sentence imposed for attempted first degree murder is amended by striking that portion of the sentence which provides that it shall be served without benefit of parole.

DECREE
Accordingly, the defendant's conviction and sentence for second degree kidnaping are vacated due to double jeopardy. His conviction for aggravated rape and attempted first degree murder are affirmed. His sentence of 100 years imposed for attempted first degree murder is amended striking that portion which provides that it be served without *766 benefit of parole. His sentence on first degree murder and the car jacking conviction are amended to strike the court's denial of eligibility for good time; however, the sentence denying good time eligibility for the aggravated rape conviction is affirmed.
Further, the case is remanded to the district court and the trial judge is ordered to inform defendant of the provisions of La. C.C.P. art. 930.8 by sending appropriate written notice to defendant within ten days of the rendition of this opinion and to file written proof in the record that defendant received the notice.
SECOND DEGREE KIDNAPING CONVICTION AND SENTENCES VACATED.
CONVICTION FOR AGGRAVATED RAPE AND ATTEMPTED FIRST DEGREE MURDER AFFIRMED.
SENTENCE FOR ATTEMPTED FIRST DEGREE MURDER IS AMENDED AND AFFIRMED AS AMENDED.
SENTENCE FOR AGGRAVATED RAPE AFFIRMED.
REMANDED WITH ORDER.